UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-104 TNM |
| JONATHAN ALAN ROCKHOLT, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jonathan Alan Rockholt to 13 months' incarceration, three years of supervised release (including one year of supervised release on the Class A misdemeanor to run concurrent), $2,000 in restitution, and the mandatory assessment of $100 for Court One (felony), and a $25 for Count Two (class A misdemeanor).   The Guidelines range as calculated by the government is 10 to 16 months imprisonment, and the government's recommendation is in the middle of that range.

## I.    INTRODUCTION

The defendant, Jonathan Alan Rockholt, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million

1

dollars in losses.[1]

As explained below, a substantial jail sentence is appropriate in this case. Rockholt traveled to Washington, D.C. prior to January 6th with a militia group, the Guardians of Freedom (GoF), aware of the possibility of violence. Rockholt prepared for violence by bringing a tactical vest and a helmet to the United States Capitol. Rockholt joined a group of rioters on the Lower West Terrace, then moved towards the tunnel ("LWT Tunnel") that was erected in preparation for the Presidential Inaugural and led to an exterior door of the Capitol Building. A group of rioters inside the LWT Tunnel were attempting to force their way past the officers responsible for securing the tunnel and preventing the rioters from entering the Capitol Building at that location. Rockholt, wearing his tactical vest and helmet, entered the LWT Tunnel and moved towards the police line holding the entry point to the Capitol. Rockholt was in the third or fourth row of rioters away from police officers. The group of rioters—Rockholt included—engaged in a heave-ho push against the officers in a concerted effort to breach the police line and force their way inside the Capitol. The officers ultimately expelled the rioters from the LWT Tunnel.

Rockholt stole a police riot shield following the heave-ho effort inside the Tunnel. He took the police riot shield after he was expelled from the Tunnel. The riot shield was marked with a United States Capitol Police seal. Rockholt and other members of his group took turns carrying the police riot shield off Capitol grounds. To date, it has not been recovered.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

The government recommends that the Court sentence Rockholt to 13 months' incarceration for his convictions of Civil Disorder and Theft of Government Property.   The recommended sentence is in the middle of the advisory Guidelines' range of 10-16 months, which the government submits is the correct Guidelines calculation. A 13-month sentence reflects the gravity of Rockholt's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 65, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Rockholt's Role in the January 6, 2021 Attack on the Capitol

Jonathan Rockholt traveled to Washington, D.C. on or about January 5, 2021 with members of a militia group called the Guardians of Freedom ("GoF"). Members of the GoF include Tyler Bensch, Brian Preller, and Benjamin Cole, among others. The group attended the rally that former President Donald Trump held on January 6, 2021. Following the rally, Rockholt and several other members of the group, entered the Capitol grounds and then traveled in a military formation towards the U.S. Capitol Building.

While on the restricted grounds of the U.S. Capitol, Rockholt wore (a) an olive green quilted jacket, blue jeans, and black gloves; (b) tactical vest with a patch associated with the "Three Percenters" movement (i.e., "III"); (c) a drab neck gaiter and sunglasses; and (d) a

3

grayish baseball helmet with a red, white, and blue skull on the back, yellow Gadsden flag[2]

symbols on the sides, and, what appears to be, the logo for GoF (described below) and a U.S.

flag on the front.   *See* Images 1-3.



**Images 1-3**

***Rockholt's Conduct inside the Tunnel***

At approximately 4:15 pm, Metropolitan Police Department (MPD) officers held their

ground inside the LWT Tunnel as they protected the Capitol from breach by rioters.   Ex. 1, at

11 seconds.   A mob of rioters in the mouth of the LWT Tunnel began pushing in concert against

the police officers.   Ex. 1, at 34 seconds.   The mob gained momentum and some sought

reinforcements by yelling and waving to other rioters to join their efforts.   Ex. 1, at 51 seconds.

---

[2]  The Gadsden flag is a historical American flag with a yellow background. Depicted on the flag
is a coiled rattlesnake and the words "Dont [or, Don't] Tread on Me."

Rockholt surfaced at the rear of the mob just outside the LWT Tunnel.   Ex. 1, at 1:18.

Rockholt, wearing his tactical vest and helmet, on which he had affixed a decal representing the III Percenters[3] and another decal with a human skull in the colors and patterns of the American flag, peered over the crowd in front of him then joined the rocking motion of the crowd against the wall of officers.   Ex. 1, at 1:22; *see also* Ex. 1-A.

---

[3]  According to the website of the Anti-Defamation League:

> Three Percenters are part of the militia movement, which supports the idea of a small number of dedicated "patriots" protecting Americans from government tyranny, just as the patriots of the American Revolution protected early Americans from British tyranny. The Three Percenter concept, created in 2008, is based on an inaccurate historical claim that only three percent of Americans fought in the Revolutionary War against the British. Three Percenters may join or form traditional militia groups but often form non-paramilitary groups or online networks. Many are not associated with any particular groups. The Three Percenter concept both contributed to and benefited from the resurgence of the militia movement that began in 2008.

https://www.adl.org/resources/backgrounder/three-percenters (visited June 22, 2023). *See also* PSR ¶ 24 n.3.



**Image 4:**  *Screenshot from CCTV of Rockholt peering into the Tunnel, Government's Sentencing Ex. 1 at 1:22.*

The pushing ceased momentarily, and Rockholt continued to monitor the actions inside the LWT Tunnel.   Approximately 20 seconds later, the momentum of the mob picked up once again, and Rockholt turned sideways and added his bodyweight to the force of other rioters trying to gain ground inside the LWT Tunnel.   Ex. 1, at 2:06-2:18.   The mob made little headway.

Rockholt found another path forward.   He slid through a gap between rioters and progressed into the LWT Tunnel.   Ex. 1, at 2:58.   Moments later, the rioters shifted and Rockholt moved to fill the void.   Again, he pushed into the rioters in front of him and, while

6

apparently holding on to another rioter, advanced deeper into the LWT Tunnel.   Ex. 1, at 3:53-4:35.   As Rockholt advanced, he contributed his force to the mob of rioters as they pushed their way towards the double doors that lead inside the Capitol and into the Metropolitan Police Officers guarding those doors.



**Image 5 :**   *Screenshot from CCTV of Rockholt deeper inside the Tunnel, Government's Sentencing Ex. 1 at 4:43.*

At approximately 4:21pm, police were finally able to expel the rioters from the LWT Tunnel.   Ex. 1, 5:29.   The officers fired a chemical spray against the rioters, causing them to retreat and allowed the MPD officers to regain ground in the LWT Tunnel.   Ex. 1, 4:43.   With the tide turned, the MPD officers successfully expelled the mob—including Rockholt—from the LWT Tunnel.

Rockholt did not leave the Lower West Terrace area empty-handed.   During the heave-ho and fighting that ensued in the LWT Tunnel between the officers and rioters, police shields were stolen from the officers and passed among the rioters.   Rockholt got a hold of one of these riot shields.   Ex. 2, at 4:20.   He carried it from the area of the Inaugural stage, across the West Plaza, then off Capitol grounds.   Ex. 3, at 7 seconds; Image 6.   The riot shield was never recovered.



**Image 6:   Rockholt carrying riot shield away from Capitol**

***Rockholt's Social Media Posts***

Following the events of January 6, 2021, Rockholt appears to have shown little, if any, remorse for his involvement in the events at the U.S. Capitol.   Instead, he continued to claim it was his right to "storm" the Capitol.   Image 7, Rockholt Instagram (Meta) Return, p. 1737.



**Image 7**

Rockholt admitted being pepper-sprayed while on Capitol grounds and described the front of the Capitol as a "war zone."   Images 8 and 9, Rockholt Instagram (Meta) Return, p. 1928-29.

| | |
|---|---|
| **Author** | alan_206 (Instagram: 443745906) |
| **Sent** | 2021-01-09 14:41:04 UTC |
| **Body** | Many of us had tears in our eyes on the capital grounds |

| | |
|---|---|
| **Author** | ███████████ |
| **Sent** | 2021-01-09 14:41:32 UTC |
| **Body** | 🗿🗿🗿🗿🗿 |

| | |
|---|---|
| **Author** | alan_206 (Instagram: 443745906) |
| **Sent** | 2021-01-09 14:41:54 UTC |
| **Body** | It was so amazing |

| | |
|---|---|
| **Author** | ███████████ |
| **Sent** | 2021-01-09 14:42:00 UTC |
| **Body** | Liked a message |

| | |
|---|---|
| **Author** | ███████████ |
| **Sent** | 2021-01-09 14:42:04 UTC |
| **Body** | Liked a message |

| | |
|---|---|
| **Author** | alan_206 (Instagram: 443745906) |
| **Sent** | 2021-01-09 14:42:09 UTC |
| **Body** | A bunch of us got pepper sprayed too |

| | |
|---|---|
| **Author** | alan_206 (Instagram: 443745906) |
| **Sent** | 2021-01-09 14:42:35 UTC |
| **Body** | It's weird cause on the side of the capital they were literally being let it from the videos I've seen |

| | |
|---|---|
| **Author** | alan_206 (Instagram: 443745906) |

**Image 8**

10



**Sent**
2021-01-09 14:42:44 UTC
**Body** In the front it was a fucking war zone

**Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent** 2021-01-09 14:42:52 UTC
**Body** There's video, I've only seen the two myself. Of Capitol Police letting people in the building.

**Author** alan_206 (Instagram: 443745906)
**Sent** 2021-01-09 14:42:53 UTC
**Body** Doesn't make any sense

**Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent** 2021-01-09 14:43:09 UTC
**Body** One was waving everyone through a barricade.

**Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent** 2021-01-09 14:43:35 UTC
**Body** The other video they opened the door, literally, to the building and were standing against the wall.

**Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent** 2021-01-09 14:43:40 UTC
**Body** Just letting them in.

**Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent** 2021-01-09 14:43:48 UTC
**Body** No. It doesn't make sense.

**Author** alan_206 (Instagram: 443745906)
**Sent** 2021-01-09 14:43:50 UTC
**Body** I saw that

**Image 9**

***Rockholt's Interview with FBI Agents***

Rockholt voluntarily agreed to an interview with the FBI following his arrest on August 24, 2022.  Rockholt admitted that he traveled from his home to Washington, D.C. as part of a group called Guardians of Freedom.  He drove separately from the group and arrived in Washington, D.C. on January 5, 2021.

Prior to the trip, Rockholt provided his personal identifying information to another individual who arranged for Rockholt to participate in a security detail through "Women for Trump" on January 6.  Rockholt purchased a tactical vest and helmet and brought the protective

11

gear with him to Washington, D.C. Rockholt thought the purpose of the gear was two-fold—personal protection because he believed Washington, D.C. was dangerous, and to associate himself with members of the Guardians of Freedom group.

Rockholt assisted with the security detail at the Trump rally on January 6.   He wore a neon vest to identify himself as part of the security detail.   Rockholt heard Trump say during his speech that people should march to the Capitol.   Many people headed towards the Capitol.   Rockholt first said he stopped by his hotel room on his way to the Capitol, but later said he was in his hotel room resting when he heard a commotion in the hallway and was told that Trump said to "meet him down here."

Rockholt said the Capitol appeared open.   He walked through the grass area towards the Capitol building.   Rockholt denied knocking down any barriers or seeing anyone fighting, but saw people standing on scaffolding, waving flags, and heard "things" going off.

Rockholt falsely denied going to the LWT Tunnel.   Rockholt admitted that he possessed a police riot shield, but that someone else took it from him.   Rockholt claimed he did not know what happened to the riot shield but said it was possible it ended up back at the hotel.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 30, 2023, an Information was filed charging Rockholt with two counts, including Civil Disorder, in violation of 18 U.S.C. §231(a)(3), and Theft of Government Property, in violation of 18 U.S.C. § 641.   *See* ECF 62. On, April 11, 2023, Rockholt was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement. *See* ECF 64.

IV.     **STATUTORY PENALTIES**

Rockholt now faces sentencing on charges of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One), and Theft of Government Property, in violation of 18 U.S.C. §§ 641 and 2 (Count Two).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Rockholt faces up to 5 years imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for the conviction on Count One; and up to 1 year imprisonment, a term of supervised release of not more than 1 year, a fine up to $100,000, and a mandatory special assessment of $25 for the conviction on Count Two.

V.     **THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The government agrees with the Sentencing Guidelines calculation in the final PSR (ECF No. 71), which is consistent with the parties' stipulations in the plea agreement.   According to the PSR, the U.S. Probation Office calculated Rockholt's total offense level as follows:

<u>Count One, Civil Disorder</u>:

| | |
|---|---|
| Base Offense Level, § 2A2.4(a) | 10 |
| Specific Offense Characteristic, § 2A2.4(b)(1)(A) | +3 |
| | 13 |

<u>Count Two, Theft of Government Property</u>:

| | |
|---|---|
| Base Offense Level, § 2B1.1(a) | 6 |

Pursuant to § 3D1.1, Counts One and Two do not group because they involve a separate harm/victim.   A multiple count adjustment is required.   Guidelines § 3D1.4(a), (b), and (c) provides direction on assigning units to multiple counts that do not group.   One unit is assigned to the group with the highest offense level.   One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious.   One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level.

Count One is the group with the highest offense level (13), and it is assigned one unit according to § 3D1.4.   Count Two is 5 to 8 levels less serious, so it is increased by one-half unit. One level is added to the adjusted offense level for Count One, resulting in a combine adjusted offense level of 14.   Rockholt accepted responsibility for the offense, so two levels are deducted, resulting in a total offense level for Counts One and Two of 12.

The U.S. Probation Office calculated Rockholt's criminal history as category I, which is not disputed.   PSR ¶ 74.   Accordingly, based on a total offense level of 12 and a criminal history

category of I, Rockholt's guideline imprisonment range is 10-16 months.   PSR ¶ 125.   However, the maximum sentence that may be imposed for Count 2 is one year, so the resulting guideline imprisonment range for Count 2 is 10-12 months.   PSR ¶ 125.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, was a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.   By its very nature, the attack defies comparison to other events.

This Court has already sentenced many January 6 defendants, including defendants who committed crimes in and around the LWT Tunnel.   This Court, in determining a fair and just sentence, should look to several factors to hold Rockholt accountable for his conduct on January 6, 2021.

Rockholt prepared for a fight before heading to the Capitol on January 6.   He wore a tactical vest with a III% patch and a hard helmet to protect his head.   Rockholt also wore sunglasses and a neck gaiter that, at times, he pulled over his nose and mouth area.   The government has been unable to determine how long Rockholt remained on Capitol grounds. However, Rockholt was in the LWT Tunnel for approximately four minutes during an aggressive heave-ho effort by rioters to take the Tunnel and force their way into the Capitol.   Rockholt

surveyed the scene before entering then made a calculated decision to join the push of other rioters and later to push his way through the rioters to get as close to the first set of double doors as possible.   While inside, Rockholt added his force, momentum, and body to the efforts of other rioters, putting pressure on the police line guarding an entry point to the Capitol.   Rockholt was forced out of the Tunnel when a chemical spray was fired in the direction of the rioters.

Although Rockholt was forced out of the LWT Tunnel, he did not leave without a souvenir—a stolen police riot shield that was taken from officers during their heroic efforts to defend an entrance to the Capitol and fend off the attack by rioters.   His theft of the shield meant that a police officer was not able to use it to protect himself or herself from the rioters who aggressively attacked the LWT Tunnel.   Rockholt never returned the riot shield.

Following his participation in the attack on the Capitol on January 6, Rockholt's story changed depending on the audience.   He minimized his conduct when agents interviewed him, denied seeing violence, and falsely denied he ever entered the Tunnel.   Yet in social media messages, he described what he witnessed on January 6 as a "war zone" and said he was pepper sprayed.   Rockholt also defended his actions when he said that he had a "right to storm" the building because "that's OUR building and OUR obligation."   These facts fully support the government's recommendation of 13 months imprisonment.

### B.  Rockholt's History and Characteristics

Rockholt has three prior convictions for offenses that apparently have one common denominator—alcohol.   PSR ¶¶ 71-73.   Following his last conviction in 2017, Rockholt reportedly attended Alcoholics Anonymous meetings.

16

Rockholt is employed.   PSR ¶ 106.   His employment history, generally, dates to 2013. Rockholt is also licensed as a Security Officer in the State of Florida.   PSR ¶ 102, n. 7.

Rockholt has complied with pretrial release conditions.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rockholt's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Although Rockholt pled guilty and is entitled to a two-point reduction for acceptance of responsibility, he does not appear to appreciate the full harm of his conduct.   Rockholt made a calculated decision to enter the LWT Tunnel and participate in a collective push against police.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

His response in social media messages was to express a sense of entitlement, not contrition.   And he has shown little, if any, remorse for his conduct.   A sufficient sentence of incarceration is necessary to provide specific deterrence against Rockholt and to ensure he gets the message that participation in a riot and theft of government property from police officers charged with protecting the seat of our federal government can never be justified or repeated.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

There are many January 6 cases that are similar to Rockholt's.   Examples include defendants Nolan Cooke, Ronnie Presley, and Moises Romero, among others, who were each convicted of Civil Disorder, 18 U.S.C. § 231(a)(3).

Nolan Cooke[7] broke through police lines on the east side of the Capitol.   He pushed against bike racks and encouraged others to do so.   When Cooke and others succeeded in breaching the perimeter, they rushed up to the Capitol and tried to break in.   Cooke used a flagpole to strike a window.   Ultimately, Cooke's efforts were unsuccessful and he eventually left the area. For his conduct, Cooke was sentenced to 366 days in custody.[8]

Ronnie Presley[9] stormed the police line on the West Terrace then entered the Capitol building at approximately 2:35pm.   Presley made his way to the Rotunda.   There, he argued with officers and refused to comply with commands to leave.   Officers pushed him towards an exit. He physically resisted officers' efforts to clear the area, and even pulled on a riot shield in defiance of the officers' efforts to expel the rioters.   For his conduct, Presley was sentenced to 12 months incarceration.[10]

---

[7]  22-cr-52 RCL

[8]  Cooke's total offense level was 11 and his criminal history category was I.   The resulting USSG range was 8 to 14 months.   The government recommended a mid-range sentence of 11 months.

[9]  21-cr-257 RDM

[10]  Presley's total offense level was 11 and his criminal history category was II.   The resulting USSG range was 10-16 months.   The government recommended a high-end sentence of 16 months.

Moises Romero[11] attended the rally then proceeded to the Capitol building.   Romero wore goggles and a respirator while on the restricted Capitol grounds.   Several police lines were breached by the time Romero arrived, and he proceeded to the stairs under the Northwest scaffolding, then went to the West Terrace.   Romero took advantage of other rioters' efforts to breach the police line on the West Terrace, then headed to the Lower West Terrace where officers still maintained control of a police line.   Romero and other rioters joined forces to push through the line.   Soon thereafter, Romero and other rioters tried to push their way through a temporary barrier erected by police officers inside the Senate Wing Door.   Officers used riot shields to fend off the rioters.   Romero grabbed a riot shield while an officer was actively using it to protect himself and a breach of the point of entry.   Romero and others eventually broke through the police line and entered the Capitol.   For his conduct, Romero was sentenced to 8 months imprisonment.

Aaron Mostofsky[12], dressed as a caveman, lent his strength and weight to other rioters' efforts of pushing against barriers to breach police lines.   A police line on the West Terrace was breached, and Mostofsky crossed onto the Upper West Terrace, where he stole protective gear—a police vest—then headed to the Senate Wing Door.   He broke into the Capitol at approximately 2:13pm, and after he entered, he stole another piece of protective equipment—a police riot shield—and carried it with him.   For his conduct, Mostofsky was sentenced to 8 months imprisonment.[13]

---

[11]  21-cr-677 TSC
[12]  21-cr-138 JEB

[13]  Mostofsky's total offense level was 12 and his criminal history category was I.   The government recommended a sentence of 15 months.

Rockholt's conduct is comparable to Cooke's, Presley's, Romero's and Mostofsky's in that they all made concerted efforts to breach police lines and gain entry into the Capitol building. Rockholt, unlike Presley, Romero and Mostofky, never made it inside.   In Rockholt's case, the officers guarding the tunnel prevailed against the rioters' heave-ho effort to breach the line and access the Capitol.   Rockholt, like Mostofsky, stole police officers' protective equipment, preventing officers' use of the equipment to protect themselves from rioters.

Rockholt's conduct is more egregious than these defendants because he came prepared for battle.   He geared up, i.e., put on protective gear—a tactical vest and hard helmet—before he went to the Capitol.   Additionally, he went to the Capitol with other members of the Guardians of Freedom who were also dressed for battle.

Luke Lints[14] and Bernard Sirr[15], like Rockholt, participated in a push against officers in the tunnel.   Lints participated in a coordinated "heave ho" push against the police line at approximately 3:11 p.m.   Lints obtained a stolen police riot shield and used it to block a metal door from closing.   Lints was ejected from the Tunnel at 3:18 p.m.[16]   Sirr participated in a coordinated push against the police line.   At approximately 4:14 p.m., Sirr engaged with officers in the tunnel then retreated after anti-riot gas was sprayed.[17]

---

[14] 22-CR-259

[15] 22-cr-259 TNM

[16] Lints pleaded guilty to a single count of violating 18 U.S.C. § 231(a)(3).   This Court sentenced Lints to a four-month term of incarceration.

[17] Sirr pleaded guilty to violations of 18 U.S.C. § 231(a)(3), 1752(a)(1) and (a)(4), and 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(F).   This Court sentenced Sirr to two months' incarceration.

Rockholt's conduct is comparable to both Sirr's and Lints'.   However, Rockholt's theft is a distinguishing factor.  Rockholt stole a police riot shield that was most likely pulled from an officer's grasp during the fight that was taking place in front of him, and this crime of removing a police officer's protective equipment from a crime scene where there is an ongoing need for it must be considered an aggravating factor against Rockholt.

Considering these factors and comparable cases, the Court should impose a 13-month sentence as requested by the government.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[18] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C.

---

[18] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rockholt must pay $2,000 in restitution, which reflects in part the role Rockholt played in the riot on January 6.[19] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Rockholt's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 153.

---

[19] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 13 months' incarceration, three years of supervised release (including one year of supervised release on the Class A misdemeanor to run concurrent), $2,000 in restitution, and the mandatory assessment of $100 for Court One (felony), and a $25 for Count Two (class A misdemeanor).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:  _____
Melanie L. Alsworth
Trial Attorney
U.S. Department of Justice
On detail to the USAO-DC
601 D Street, N.W.
Washington, DC 20530
Phone: (202) 598-2285
Email: melanie.alsworth2@usdoj.gov

_____
Holly Grosshans
Assistant United States Attorney
601 D. Street, N.W.
Washington, D.C.   20530

26