UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

V.                                            CASE NO. 1:23-CR-104-TNM

JONATHAN ALAN ROCKHOLT,

    DEFENDANT.

_____/

## SENTENCING MEMORANDUM

Defendant Jonathan Alan Rockholt, by and through undersigned counsel, respectfully submits this sentencing memorandum for the Court's consideration.

## I.  SUMMARY

Mr. Rockholt graduated high school and worked mostly as a laborer for his adult life. He has not traveled extensively nor is he someone considered worldly.

Mr. Rockholt supported President Donald Trump. In 2020, he attended many Trump events and rallies.  In this way, he became acquainted with Mark

Clark, the leader of Volusia for Trump.[1] They were friendly, but not close friends. Mr. Rockholt was invited to Mr. Clark's home on a few occasions.

In mid-to-late December, 2020, Mr. Clarke asked Mr. Rockholt if he wanted to join a group called Guardians of Freedom, a community group dedicated to protecting the Constitution. Mr. Rockholt joined at that time.  Mr. Clarke also informed Mr. Rockholt that in January, the Guardians of Freedom would have an event in Washington, and asked if Mr. Rockholt would care to accompany him and a few others. Mr. Clarke told Mr. Rockholt that there would be a speaking event near the Ellipse, and that the group would help seat people, and provide security for the event. Mr. Clarke asked Mr. Rockholt to participate because Mr. Rockholt held a Florida security guard license. The people who would be going to this event were all people Mr. Rockholt had met at Trump rallies.

Mr. Clarke told Mr. Rockholt that this was a free trip. All his expenses were paid, except for the gasoline which Mr Rockholt contributed to for the drive to Washington. Mr. Rockholt had never been to Washington, this seemed

---

[1]      Volusia is a reference to Volusia County, Florida, which is located on Florida's east coast.

to him to be a wonderful opportunity. At no time before the trip did Mr. Clarke or anyone else discuss entering the Capitol, or preventing the certification of the election. He was, however, advised to bring protective gear because of previous attacks that had been made upon Trump supporters.

Mr. Rockholt and Chuck Martin, with whom Mr. Rockholt rode to Washington, checked into their rooms on January 5, and the next morning, Mr. Rockholt and perhaps 20 other people met in front of the hotel, to walk together to the site where the speaking event was to take place. When they arrived, there was total confusion. Nobody appeared to be in charge, nobody told them what to do, and most of the group was angry about this. When some stranger ordered Mr. Rockholt and Mr. Martin to pick up trash, they got disgusted and decided to leave. Mr. Rockholt returned to the hotel.

Thereafter, Mr. Rockholt heard a commotion in the hall. When he looked out, one of the people in the hall told him to get dressed, because they were going to the Capitol. As far as Mr. Rockholt knew, this was to be a simple protest. He did not know that Congress was certifying the election, or that it was any part of the purpose of the group to prevent Congress from doing so.

Mr. Rockholt and the group walked right up to the Capitol, with no resistance. No one stopped them to tell them they couldn't be there. They did not break any gate or fence, or anything. If police officers had told him they weren't allowed to be there, he would have left.

When Mr. Rockholt neared the Tunnel, there was chaos. People were screaming and pushing against each other. Mr. Rockholt did see police officers facing the crowd, but was caught up in the moment cheering for Trump. Plainly put, Mr. Rockholt did not intentionally contribute to what the PSR describes as the "heave-ho." Rather, his body was being pushed against the bodies of people in front of him, by people behind him. As for the shield, Mr. Rockholt offers no excuse for that lapse of judgment.

## II.   APPLICABLE LAW

It is now well established that the Sentencing Guidelines are advisory only. *United States v. Booker*, 543 U.S. 220, 245-67 (2005). The Court must consider every convicted person as an individual, and every case as unique. *Gall v. United States*, 552 U.S. 38, 53 (2007). To treat the guidelines as mandatory violates a defendant's Sixth Amendment rights, *Booker*, 543 U.S. at 244-245, and

for the sentencing judge to treat the guidelines as presumptively reasonable is also error, *Rita v. United States*, 551 U.S. 338, 351 (2007).

### III.   THE RELEVANT 18 U.S.C. § 3553(A) FACTORS

A. 18 U.S.C. § 3553(a)(1), Nature and Circumstances of the Offense

Although Mr. Rockholt, by entering a plea of guilty, acknowledges that he committed the offense charged, the offense was not something he planned so much as it was something he fell into. As described in the summary above, Mr. Rockholt was offered a free trip. The services he was asked to provide were ordinary, reasonable, and not criminal. He traveled to Washington, D.C. to provide security services for a speaking event. He did not travel there with the intent to enter the Capitol Building. He followed the group he was with to the Capitol, and committed the offense while caught up in a highly emotional crowd of people.

<p align="center">Notable Errors in the PSR</p>

Mr. Rockholt accepts the overall description of the events of January 6, 2021 as related in paragraphs 15 through 21, but has objected to certain statements in the draft PSR which relate to his own participation. The objections relate to specific provisions where the U.S. Probation Office ("USPO") failed to

<p align="center">5</p>

meaningfully conduct an independent assessment and consider the actual conduct in this case. In each instance, the USPO failed to find evidence sufficient to include this information in the PSR, but did so nonetheless.

In the addendum, the USPO concedes that to include relevant conduct, the standard is proof is by preponderance of the evidence. The preponderance of the evidence standard requires the Court to "make a comparative judgment about the evidence" to determine whether a proposition is more likely true than not true based on the evidence in the record." *Almerfedi v. Obama*, 654 F.3d 1, 5 (D.C. Cir. 2011).

<u>¶ 29 – No Evidence of a Knife</u>

Paragraph 29 states that Mr. Rockholt wore "what appeared to be a knife in his front right pocket." This is included because a federal agent wrote in a complaint that the first picture at paragraph 29 showed something in Mr. Rockholt's pocket that appeared to be a knife. All that is visible in the picture the PSR contains is a metal clip, which could be attached to anything. Because it could be anything, the USPO's assertion that this appears to be a knife is not even a reasoned conclusion, it is a mere guess.

Even the government concedes there is no evidence to prove that a knife was present. No cooperators have said that Mr. Rockholt had a knife. Mr. Rockholt did not take a knife to Washington. This cutting and pasting from the complaint is significant to Mr. Rockholt even though it adds no points to his guidelines score. The Bureau of Prisons can use this information to assess Mr. Rockholt a higher security risk rating when designating him to a facility.

The USPO reports to this Court that the government contends "the information in the Complaint is 'accurate…'" The Complaint describes that item as "what appears to be a knife..." Dkt. 5-1 at 13. The agent, under oath, does not say that it is a knife. Despite this the USPO's response goes even further off field to say "the Government takes that position that the statement about the knife is accurate." In short, the government concedes that the agent believes it appeared to be a knife, not that it was a knife. Notably, the government does not rely on the item being a knife to justify the sentence it has recommended to this Court. Dkt. 73.

Simply put, there is no evidence other than the picture that supports the USPO's conclusion. While it has been reported (and this Court has seen) that some rioters had weapons on January 6, that cannot be used to generally prove

7

that Mr. Rockholt had a knife. The picture does not depict sufficient evidence that makes it more likely than not that Mr. Rockholt had a knife. All references to a knife should be stricken from the PSR.

<div align="center">¶¶ 22, 24, 25, 26, 28, 29 & 90 – Never a B Squad Member</div>

Several paragraphs broadly imply that Mr. Rockholt was a member of B Squad, and explicitly state that he identified himself as such. This is also inaccurate. Accordingly, Mr. Rockholt has objected to those references in paragraphs 22, 24, 25, 26, 28, 29, and 90. Mr. Rockholt was a member of Guardians of Freedom and of the Three-Percenters but not of B Squad. During the FBI interview, he denied being a member of B Squad, and in fact, did not know what it was. At no time did he identify himself as a member of B Squad – and the Complaint never details when he did so. He was not wearing a B Squad insignia, did not receive the "Calling All Patriots!!" flyer, and was not on the B Squad distribution list. The paragraphs of the PSR which describe actions by unidentified B Squad members should not impute those actions to Mr. Rockholt.

The USPO contends that Mr. Rockholt self-identified as a B Squad member yet fails to include any evidence where Mr. Rockholt held himself out

to be a B Squad member. The USPO relies on several things, none of which individually or collectively, meet the preponderance of evidence standard. For example, Mr. Rockholt had "contact" with B Squad members. That contact is not further defined. Mr. Rockholt had contact with the Court during his change of plea hearing, but that does not make him a member of the federal judiciary. While Mr. Rockholt stayed in a hotel with a number of people who belonged to various groups that rioted on January 6, he does not automatically become members of their groups – much less just the ones that stayed on the same floor he did. Again, the government does not suggest in its sentencing memorandum that Mr. Rockholt was a B Squad member. Dkt. 73.

B. 18 U.S.C. § 3553(a)(1), Defendant's History and Characteristics

Mr. Rockholt is a lifelong resident of Central Florida. His parents, with whom he currently lives, reside in Palm Coast, Florida. His brother Christopher, is in the Army and is stationed in Oklahoma.  He is unmarried, and has no children.

Mr. Rockholt grew up in a lower middle class home. His parents sometimes struggled, but always provided adequately for him and his brother.

His parents are very supportive; they are contributing to his legal fees. Mr. Rockholt's brother also remains supportive.

Mr. Rockholt graduated from St. Cloud High School in St. Cloud, Florida. He has no further formal education. He is a skilled machine operator and truck driver. He has a Class A Commercial Driver's License. He has a State of Florida Security Officer license, but will lose it based on the felony conviction in this case. He has been continuously employed since 2011.

Mr. Rockholt excelled at two jobs in his life, serving Volusia County as a senior maintenance worker in the Parks Department and serving as an armed security officer for companies that faced high risk of thefts. Mr. Rockholt resigned from the Volusia County job, one that included retirement and health benefits, because a supervisor told him that this offense was going to result in Mr. Rockholt's termination. The supervisor suggested that if Mr. Rockholt wanted his job back after this case concluded, his prospects would be better if he resigned rather than be fired. Further, the supervisor told Mr. Rockholt when applying for any future job it would look better if he resigned rather than be fired. A collateral consequence of this conviction will be Florida's termination of Mr. Rockholt's armed security guard license. As a consequence

of his action, Mr. Rockholt has worked to obtain his commercial driver license and has learned to drive commercial vehicles. In short, he is starting over again.

Mr. Rockholt is in good health, both physically and mentally. He has had three alcohol-related misdemeanor traffic convictions, at ages 20, 22, and 32. After the third conviction, in 2016, he attended Alcoholics Anonymous meetings, and currently does not abuse alcohol. He does not use drugs. The criminal driving convictions are Mr. Rockholt's only criminal convictions. In each case, he was sentenced to a term of probation, which he successfully completed.

Mr. Rockholt was released, under the supervision of the Pretrial Services Agency and has not violated any condition of pretrial release.

C.  18 U.S.C. § 3553(a)(2)(A) Need for the Sentence to Reflect Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment.

An important aspect of this factor is to distinguish between the aggregate conduct of all the January 6, 2021 protesters and Mr. Rockholt's conduct. A broad range of conduct occurred, ranging from peaceful, non-criminal protest involving pure First Amendment speech, to violent attacks against police officers. The attack was a serious wrong, but Mr. Rockholt's individual conduct

was not the most serious. He trespassed in the Capitol and into the Tunnel, and picked up a police shield, which he passed on to others and which has not been recovered. Although the PSR describes him as contributing to an effort by the crowd to push police officers who were blocking entry to the Capitol, Mr. Rockholt did not voluntarily contribute to this effort. Rather, he was trapped between persons who were pushing him from behind, and persons who were pushing against the police officers. He was unable to extricate himself from the crowd. It is essential to the goals of sentencing that those who beat law enforcement officers and vandalized the Capitol be prosecuted and punished more harshly than those who were merely caught up in the event. It does not serve the goals of 18 U.S.C. § 3553(a) for the law to punish Mr. Rockholt not only for his own conduct, but for the actions of those who behaved violently.

D. 18 U.S.C. § 3553(a)(2)(B) Afford Adequate Deterrence to Criminal Conduct

18 U.S.C. § 3553(a)(2)(B) requires the court to consider the need to afford adequate deterrence to criminal conduct. Note the word "consider." This is not synonymous with "assume" that sentencing naturally and inevitably accomplishes general deterrence. That is an assumption that has been disproved.

It may have been true that harsh punishment accomplished general deterrence in the days when people were hanged in public, or displayed in the stocks and pillory, or tied to a whipping post in the middle of the town square. It is not unreasonable to assume that people who actually see what committing a crime may cost them will be deterred from taking the risk of such punishment. It is not reasonable to make that assumption when the penalty imposed is not made clear to the public in such a visceral way; when the penalty is, for all practical purposes, hidden from the public.

So to "consider" general deterrence should include to "consider" whether sentencing actually accomplishes deterrence.  All the research for 30 years and more shows that it does not.

Deterrence is a negligible factor. Although deterrence is an important goal, the idea that harsh sentencing works to accomplish this goal is a myth - wishful thinking on the part of the government and the public. A Department of Justice study found that certainty of being caught is a vastly more powerful deterrent than punishment. The National Institute of Justice, *Five Things About Deterrence*, [*Five Things*] United States Department of Justice, (May, 2016).

The theory behind increasing punishment to effect deterrence arises from the belief that "the severity of punishment may influence behavior if potential offenders weigh the consequences of their actions and conclude that the risks of punishment are too severe." Wright, Valerie, *Deterrence in Criminal Justice; Evaluating Certainty vs. Severity of Punishment* [*Certainty vs. Severity*] The Sentencing Project (2010) at 2.[2] The fallacy of this theory is that it assumes that people act rationally and consider the consequences of their actions before deciding to commit a crime. Additionally, potential offenders are unlikely to be aware of the specifics of sentencing policies. *Certainty vs. Severity* at 3. The same conclusion has been reached by many judges, with respect to a variety of crimes:   remarks by judges who presented at the 2000 Economic Crimes Symposium sponsored by the Sentencing Commission indicated their firm belief that the loss tables don't deter anyone, because defendants have no idea they exist. U.S. Sent'g Comm'n, *Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses*, Plenary session III at 68-69 (2000) [Symposium]. One judge suggested, regarding the drug guidelines, that the

---

[2]     Available at http://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

U.S. Attorney get billboards and advertise what the guidelines sentences are. *Symposium* at 68. *Certainty vs. Severity* reports on several studies conducted between 1971 and 2003 that have concluded that harsh sentences do not reduce recidivism, rather, they increase it. *Certainty vs. Severity* at 6-7.

So far as undersigned counsel has been able to determine, this has been the conclusion reached by every such study, including at least one by the Department of Justice.[3] As to the goal of deterrence, harsh sentences just don't work.

---

[3]     National Institute of Justice, *Five Things About Deterrence*, United States Department of Justice (May, 2016).  Sending an offender to prison is not effective way to deter crime; increasing the severity of punishment does little to deter crime.

Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013) (increases in punishment levels do not deter crime because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.)

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) (certainty of punishment is empirically known to be a far better deterrent than severity.).

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, increases in severity of punishments do not yield significant (if any) marginal deterrent effects).

David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995) (Research regarding white collar offenders

The government suggests in its sentencing memorandum, dkt. 73, that Mr. Rockholt's social media posts three days after riot demonstrate a lack of remorse. Of course, the government is correct that three days later Mr. Rockholt did not express any remorse. However, on August 24, 2022, 20 months later, when agents arrested Mr. Rockholt, Mr. Rockholt expressed great remorse, voluntarily confessed to his role without asking for counsel, and did not insist that the government indict him, as others who were charged in the same complaint have insisted.

E.  <u>18 U.S.C. § 3553(a)(2)(C) Protect the Public from Further Crimes</u>

Mr. Rockholt's previous offenses were all misdemeanor traffic violations, alcohol related.  The most recent was more than six years ago, and Mr. Rockholt has stopped abusing alcohol. Nothing in his background indicates that he is likely to commit a criminal offense in the future. Further, when federal agents went to Mr. Rockholt's house to arrest him, Mr. Rockholt cooperated and provided a voluntary statement to agents. He has pleaded guilty,

---

in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment).

demonstrating both that he recognizes his own culpability and his intention to respect the law in the future.

F. 18 U.S.C. § 3553(a)(3) Kinds of Sentences Available

Count One, civil disorder, is a Class D felony. The maximum term of incarceration is five years, the maximum fine is $250,000, and the maximum term of supervised release is three years. Count Two, theft of government property, is a misdemeanor. The maximum term of incarceration is one year. maximum fine is $100,000, and the maximum term of supervised release is one year.

G. 18 U.S.C. § 3553(a)(4) Kinds of Sentence and the Sentencing Range

The estimated offense level is 12. For a Category I offender, the applicable sentencing range is in Zone C, 10 to 16 months, for which incarceration is not required.

H. 18 U.S.C. § 3553(a)(6) Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records

On January 6, 2021, thousands of protesters stormed the U.S. Capitol. They came with varying intentions and performed a wide range of actions. The presence of each individual rioter contributed to the chaos of the day, helped to outnumber police officers who were guarding the Capitol, and ultimately

delayed the peaceful transition of Presidential power. Each demonstrator contributed to the mayhem in his own way. Some were actively violent. Some made threats. Some damaged property. Some were leaders, and some were followers. Many fell somewhere along that continuum. Those individuals who have been prosecuted have been charged with a wide variety of criminal offenses.

Mr. Rockholt's conduct falls closer to the less serious end of the continuum. He was charged with, and pled guilty to, two offenses. He was not charged with an act of violence. The following examine similar cases that have occurred before this Court.[4]

In *United States v. Petrosh*, case number 1:21-cr-347-TNM, the defendant was a former U.S. Marine who pled guilty to a misdemeanor count of theft of government property, in violation of 18 U.S.C. § 641. According to the government's sentencing memorandum, the defendant deliberately positioned himself at the front of a standoff with Capitol Police *inside* the Crypt, said to an officer "Give us Nancy" and was at the front of pack of rioters who chased law

---

[4]     While the government uses cases before other members of this Court, Mr. Rockholt knows this Court did not have the benefit of the factual basis for those cases or the PSRs. Accordingly, Mr. Rockholt's analysis is limited to those cases assigned to this Court.

enforcement officers down a hallway and into the Hall of Columns. He did not thereafter leave the building through the Hall of Columns but turned back to rejoin the fray inside the building. The defendant stole two microphones from the Speaker's lectern and smoked a cigarette in the Rotunda. When agents interviewed the defendant, he minimized his conduct and *post-plea* told agents that Congress was "lucky that's all that happened." As of the date of sentencing, the defendant did not regret storming the Capitol and believed his actions were justified. The government asked for a sentence of 120 days incarceration. The Court imposed a sentence of 10 days incarceration, with credit for time served.

In *United States v. Council*, case number 1:21-cr-207-TNM, the defendant pled guilty to six offenses in the indictment against him, including one count of civil disorder, a violation of 18 U.S.C. § 231. The defendant did not enter into a plea agreement with the government. In its sentencing memorandum, the government described the defendant, a former college football player, as committing an act of violence against police officers by lowering his head stuck out his arms, and rammed into a line of police officers. The government asked

19

for a sentence of 30 months incarceration. The Court imposed 60 months of probation with six months home detention.

In cases where this Court imposed prison time, there were more charges, or charges including violent conduct by the defendant. The first case involves two defendants in *United States v. McCaughey, et. al*, case number 1:21-cr-40-TNM – Tristan Stevens and David Mehaffie.

Stevens was convicted after a bench trial of 10 counts in the fifth superseding indictment, including section Civil Disorder, Engaging in Physical violence in a Restricted building, and an Act of Physical Violence in the Capitol Grounds or Buildings. Stevens threatened police officers by asking them if they were ready to be killed for being traitors and called then cowards. "For the next one and a half hours, Stevens assumed an integral role in the attack on officers in the strive to enter the Capitol building." 1:21-cr-40, Dkt. 555 at 6-7. Stevens even assumed a leadership role to coordinate the mob attack against officers, including yelling "heave" as he used his full force and a riot shield in a heave-ho push against officers. At trial, the officer Stevens physically pinned with the riot shield recounted the attack he suffered. The government sought a sentence of 78 months and this Court sentenced Stevens to a total of 60 months.

David Mehaffie was also found guilty after a bench trial on the fifth superseding indictment of several counts, including an Act of Physical Violence in the Capitol Grounds or Buildings. In the government's sentencing memorandum, it detailed how the defendant led the assault into the Lower West Terrace Tunnel "bringing the mob toe-to-toe" against officers. 1:21-cr-40, dkt. 526 at 13. "For the twenty-six minutes that Mehaffie perched himself at the tunnel entrance he was, in every sense of the word, a leader." *Id*. Without hesitating, Mehaffie entered through the outer – now broken – set of glass doors, opened the inner set of glass doors, and held the door open as other rioters walked directly up to the officers inside." *Id*. at 15. Although engaged in a violent push against officers, "he did not personally engage in physical violence." *Id*. The government recommended a 67 month sentence, the Court, after only crediting a portion of Mehaffie's trial testimony, sentenced him to 14 months, one month more than the government's request in this case. Mehaffie is serving his sentence at the Federal Correctional Institute in Ashland, Kentucky.

https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited June 30, 2023).

For comparison, the government uses *United States v. Lints*, et. al, 1:22-cr-259-TNM. Both defendants, like Mr. Rockholt, were arrested on a complaint. However, the government had to indict both defendants and both defendants engaged in conduct that was significantly worse than what Mr. Rockholt did, as explored below.

According to the government, Lints "engaged in a coordinated push" and used a police shield to prevent officers "from closing the metal door to separate the police from the rioters. He then pushed the police shield against a police shield being held by an officer." 1:22-cr-259, dkt. 58 at 2. Lints actually made physical contact with the line of police officers, and handled a total of three police shields during his time rioting at the Capitol. Finally, Lints posted on social media and appeared on a podcast *after* his arrest in which he justified his conduct "to prevent officers from assaulting protesters." *Id.* at 8. Shortly before sentencing, Lints posted on social media that law enforcement officers brutally attacked protestors and that the FBI instigated the January 6 riot. *See id.* at 10-12. Lints pleaded guilty to one of six counts.

Lints was sentenced to 4 months and his conduct was far more serious that what Mr. Rockholt did on January 6. Further, Lints continued to foster false narratives inconsistent with accepting responsibility after he pleaded guilty, something Mr. Rockholt has not done.

Bernard Sirr, the co-defendant, was a former member of the U.S. military and nuclear engineer at the Rhode Island Nuclear Science Center on January 6, 2021. According to the government, Sirr "engaged in a coordinate push against" officers. Dkt. 53 at 2. Sirr was a Proud Boys member. *See id*. at 3. Sirr was so close to officers in the Lower West Tunnel that he placed his hands on a police shield that an officer held and pushed against it. *See id*. at 6. Sirr also "engaged in a coordinated 'heave ho' series of thrusts against the police guarding the tunnel." *Id*. Sirr entered the tunnel and made his way to the front two separate times on January 6. *See id*. When agents arrested Sirr, he lied about engaging in violence. *See id*. at 15. He also failed to disclose his violent acts in a proffer before his plea. *See id*. at 15-16. Further, during the proffer Sirr said he acted to protect a couple and their minor child, but the government never found any evidence that such a family existed at the riot. *See id*. at 16-17. Sirr

also pleaded guilty to one count of the six in the indictment that was pending against him.

Sirr was sentenced to 2 months and his conduct was far more serious that what Mr. Rockholt did on January 6. Further, Sirr lied to agents during his confession and misled offices in a proffer before his plea but after his arrest, something Mr. Rockholt has not done.

Mr. Rockholt's conduct on and after January 6, 2021, was less severe than Petrosh, Council, Stevens, Mehaffie, Lints, and Sirr. Further, his conduct during the pendency of his criminal case has been far less reprehensible than that of Lints and Sirr. Accordingly, Mr. Rockholt requests a sentence of probation, without incarceration, to serve the goal of avoiding unwanted disparity in sentencing.

### I.   18 U.S.C. § 3553(a)(7) Need to Provide Restitution to Victims

In his plea agreement, Mr. Rockholt agreed to pay $2,000 in restitution. Indeed, the costs to repair the damage to the Capitol and its grounds are substantial. Mr. Rockholt works at an hourly wage and will for the remainder of his life. As a result, placing Mr. Rockholt into custody does not serve this factor. Further, upon information and belief from other defense attorneys

involved in similar cases, the Bureau of Prisons is designating all defendants sentenced to incarceration to serve the terms of imprisonment at a Bureau of Prisons facility and not the local jails where the defendants reside. The collateral effect of this will cause Mr. Rockholt to take longer to get employed to make his restitution payments.

J.   Character Letters

Filed contemporaneously with this Sentencing Memorandum are character letters attesting to Mr. Rockholt's good character. The letters are from:

1.   Becki and Jimmy Rockholt, Mr. Rockholt's parents

2.   Chris Rockholt, Mr. Rockholt's brother

3.   Alex Chase, lifelong friend

4.   David Deskins, a longtime friend

5.   John LaDuca, a lifelong friend

6.   Judy Barefoot, Mr. Rockholt's elementary school teacher

**IV.   CONCLUSION**

A sentence of time served with a significant period of supervised release, restitution, and special assessments, is "sufficient, but not greater than necessary to accomplish the goals of sentencing." Mr. Rockholt requests that

the Court impose this sentence. Alternatively, a sentence of not more than 12

months' probation would be sufficient.

Respectfully submitted on June 30, 2023.

<div style="margin-left: 40%;">

**LAW OFFICES OF HORWITZ & CITRO, P.A.**

By:     <u>s/ *Vincent A. Citro*</u>
        **VINCENT A. CITRO**
        D.C. Bar Number: 153164
        District Court Bar Number: FL0021
        17 East Pine Street
        Orlando, Florida 32801
        Telephone: (407) 843-7733
        Facsimile: (407) 849-1321
        vince@horwitzcitrolaw.com

</div>

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 30, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to Melanie L. Alsworth, Trial Attorney, at melanie.alsworth2@usdoj.gov, U.S. Department of Justice, Narcotic & Dangerous Drugs Section, c/o 601 D Street, N.W., Washington, D.C. 20530, and Holly Grosshans, Assistant U.S. Attorney, U.S. Attorney's Office for the District of Columbia, 601 D Street, N.W., Washington, D.C. 20530.

**LAW OFFICES OF HORWITZ & CITRO, P.A.**

By:     <u>s/ *Vincent A. Citro*</u>
        **VINCENT A. CITRO**
        D.C. Bar Number: 153164
        District Court Bar Number: FL0021